We'll hear the next case, Protostorm. May it please the Court, Greg Williams, Wiley Ryan, LLP, on behalf of Defendant, Appellant, the ATSK Law Firm, and Mr. Schiavelli. I've reserved two minutes of my total of eight minutes for rebuttal. I'm going to address three issues, patentability, damages, and contempt. Plaintiff Protostorm's alleged invention purports to cover a method and system for providing dynamic advertising within Internet video games. To prevail on its malpractice case, Protostorm must show that its alleged invention was patentable. Remarkably, Protostorm challenges this basic requirement. In doing so, Protostorm urges this Court to ignore the Encyclopedia Britannica decision, another malpractice case hinging on patentability, which Protostorm dismisses as non-final. Since the briefing in this appeal, the D.C. Circuit has summarily affirmed the District Court's Encyclopedia Britannica decision, 653 Federal Appendix 764, confirming that 1. A patentable invention is required to prevail on a malpractice claim, because otherwise the plaintiff has suffered no cognizable damages. 2. The Supreme Court's statutory interpretation of Section 101 dealing with patentability in its seminal June 2014 ALICE decision applies retroactively. And 3. An alleged invention that teaches nothing more than the performance of a longstanding business concept on the computer and or Internet is not patentable, a question that can be decided as a matter of law. Encyclopedia Britannica is absolutely on all fours with this present case. Protostorm asserts that its alleged invention was patentable. There is, however, an abundance of case law holding that an attempt to patent a basic marketing concept as implemented on a computer is impermissible. Federal Circuit Judge Price Was ALICE raised? Was ALICE raised? Was this issue submitted to the jury? This issue was not submitted to the jury. It's not a jury question. It's a question of law. And Chief Judge Katzmann, I think you were going to ask That was the same question. The issue of patentability was not raised during the trial by you, right? So first, by ATSK, I was not trial counsel. By you personally. Understood, Your Honor. And the Supreme Court's ruling in that case was handed down more than a month before trial. It was, Your Honor. And that ruling was based on prior Supreme Court precedent that likely would have been well known to the patent attorneys who were arguing the case. Two things, Your Honor. First, it was an extension, an extreme extension of well-known precedent. It was a complete transformation of what Section 101 means in the context of abstract concept. Two, as you noted, it was decided only a little more than a month before trial in this case. Three, and most fundamentally It's a Supreme Court decision. It is. Three, most fundamentally, it's a pure question of law. It does not require any other factual determinations. And the Supreme Court in ALICE itself, the Federal Circuit on numerous occasions, and have decided the ALICE question as a matter of law. They do so by merely affording the patent language the most reasonably favorable interpretation to the plaintiff, to the patent holder. Aren't there factual issues that come into play? Absolutely not, Your Honor. All of those cases that I'm talking about, look at the patents in question. In this paradigm, what we're talking about here is the implementation of a basic business concept, here a marketing concept, as implemented on the Internet and computers. Why haven't you, why isn't it waived by you? So the relevant case law is Pittman v. Grayson and the Baker and Fabry cases. In Pittman v. Grayson, the Court said a pure question of law such as this, that is raised in post-trial briefing as it was here, is properly preserved. And so we've properly preserved this argument because it is a pure question of law. Was it raised in the 50A motion during trial? It was raised in the 50B motion, not in 50A. Just exactly as in Pittman. And the reason that that matters, in part, is that a Rule 50 motion is a sufficiency challenge regarding the factual issues. This is not a sufficiency issue. This is a pure question of law. And Baker and Fabry also say even if the argument is, if it's a pure question of law, was not raised at the district court level, this Court can decide it. Here, because it was raised under Pittman, it was properly preserved. Those are the words of this Court. Properly preserved. But you seem to be getting a, trying to have a completely different trial here because it simply wasn't at issue on 101, or I think even on 103 during trial, when it seems to me that that issue was staring everybody in the face, it just wasn't raised. This is not a trial issue. This is a question of law. I mean, there are issues. For example, the concept of tracker user activity as a computer game progresses and targeting advertising to a user, the questions of whether it's merely an application of an abstract concept as distinct from an inventive concept that manipulates computer technology. There are factual underpinnings. Aren't there in this case that . . . Absolutely not, Your Honor. There is an avalanche of case law that says when all the patent does is recite a business concept and say that that business concept is going to be applied using generic computer functions, there is no question of law. These cases are decided on 12B6 and 12C, and the Federal Circuit has affirmed them multiple times. Here, ProtoStorm inadvertently actually described the operative language of its patent as generic phrases. There is no reasonable construction of this patent in which there are factual disputes as to whether this is anything more than the implementation of a marketing concept on a computer and the Internet. Well, let me ask you about the obviousness argument. Why haven't you waived that argument, too? Where did you previously make that argument? The experts addressed obviousness below, and in the Rule 50A motion, the trial counsel said that patentability was still at issue, and if you look at the Greenway case and the Eversini case, they both say that you can look at the context of the case as a whole to determine what the Rule 50A objection stands for, and ProtoStorm was well on notice that obviousness was at issue, and it still presented no evidence on that issue. Regarding the contempt order issued by the district court, what's the authority that you can give me to support the notion that operating expenses incurred in the course of business can include payments that are made by the law firm after it has stopped practicing law? So, first, I think it's important to look at the actual requirement for contempt here, and though it's an abusive discretion standard, it's a higher, more restrictive review by you or exacting review by you. The order itself must be specific and unambiguous. That's the first requirement. The court here actually admitted that the order was ambiguous. There's no question that the order was ambiguous, and the only record evidence, which was a lawyer with 30 years of corporate experience, was that the expenses incurred here, which were incurred prior to the law firm being forced to stop practicing law by this judgment, but were paid after it did, that those expenses were incurred in the ordinary course of business, and they were paid in the ordinary course of business. The judge here, the district court here, didn't say that they weren't. What the court said is that the payments violated the unstated purpose of the order. That by itself cannot be contempt under any circumstances. It certainly cannot be here, where there was an actual stated purpose to the order. The order said, in light of the Alice decision, I'm going to stay in enforcement and impose these restrictions to allow post-trial briefing. There was not an unstated purpose or stated purpose, I should say, that addressed not making payments to third parties after the law firm had ceased practicing law. Thank you. May it please the court, I'm representing Carl Brundage, appellant in this case, and also cross-appellee in this case.    I'd like to reserve, I've asked to reserve one minute for rebuttal. I'd also like to reserve one minute to oppose the appeal, the cross-appeal in this case. You've got three minutes, right? And then you have one minute in rebuttal. And then for my opposition to the cross-appeal, how would your honor like that to be allocated? Okay, one minute. One minute would be great. Thank you. So this is a case where the plaintiff had a team of lawyers, three different lawyers from different firms, assist plaintiff in drafting the patent at issue in this case. Those lawyers brought in the Antonelli firm to help with the filing of the patent and potentially prosecuting a PCT application. Mr. Brundage was involved in a very limited way. He had a supervisory role in connection with the filing of the patent. In other words, he was the responsible partner at ATSK on the whole deal, wasn't he? He was the responsible partner. And in that capacity, he was also involved in the termination of the relationship with the client when the client did not pay its bills and when the client did not provide a power of attorney. And he's the one who later on said, I don't have the exact words, but essentially, don't worry about it. There's some ministerial things that have to be taken care of when he knew or should have known that deadlines had been missed. That was actually a part of the trial record which was attributed to Mr. Brundage, but was not actually said by Mr. Brundage. That was said by Dale Hoag, who is not a member of Antonelli Law Firm and was not in any way affiliated with Mr. Brundage. It was, I think- It wasn't Brundage who told them, don't worry about this. There's some ministerial things after the deadlines for filing the country designations had passed. It was not. The only two record communications with Mr. Brundage passed those deadlines. One of those deadlines, Mr. Brundage was not aware had passed because he didn't know that the US was missed on the application. The other was a power of attorney, which he had repeatedly notified them was that they would be missing that deadline and extended it once. But the- If you're the partner in charge and you simply don't know something that's pretty critical to the patent application, you're absolved of any responsibility in terms of negligence or perhaps callous disregard? In terms of negligence, that would be a mistake that was made. But as plaintiffs acknowledged at trial and before trial, there was no causal connection between that patent application as filed and not receiving the patent. The patent application as filed, as you can see from the record, they didn't receive a patent in any jurisdiction. In the 90 or so that were designated, they didn't, because the patent application as filed was not something that was patentable. It required amendments and changes to the patent. And so the counsel who were responsible for drafting the patent- We don't know that it was not patentable, right? They just said it required changes. It was not patentable as drafted, so it would have to be the- It's your position. It would have to be the counsel who's responsible for drafting or amending the patent who would be held responsible for that. So, can you point to where in the trial or post-trial proceedings did Proto Storm clearly waive the right to argue that you and for the compensatory damage award? And this may be skipping ahead to the argument that they're going to make later, but very clearly throughout the trial, they said that there would be an apportionment of damages post-verdict and post-judgment. An apportionment of damages would be inconsistent with joint and several liability. Their brief on apportionment of damages did not seek to hold all the parties jointly and severally liable. The brief specifically said that ATS and K would be solely liable for 75% of the damages, which is inconsistent with joint and several liability. The first time they raised it was in a Rule 60A motion to correct a procedural deficiency in the judge's order in which they made citations to cases and really made a motion for reconsideration. The opening brief there still did not seek joint and several liability. What it did seek was 75% to ATS and K. They called it joint and several liability for 15% to Mr. Brundage and 6% to Mr. Bailey. But that's not how joint and several liability works. Correct me if I'm wrong, but I thought joint and several liability works as follows. The jury assigns 75% of the fault to somebody, 6% to somebody else, 15% to somebody else. But if there's joint and several liability, the judgment can be collected against any one, two, or three of them. And then the parties inter se, if need be, have cross claims to allocate it among themselves. But I thought the 100% judgment can be collected initially against any of the three. Am I wrong about that as a matter of law? If it were to apply, you would be correct. But in order for it to apply, they would have to seek joint and several liability. In the Wells Fargo case, which they cite, there are standards and elements. There's a burden of proof, and you have to prove it by a preponderance of evidence. If you look at their brief on apportionment post-verdict, they don't lay out a case for joint and several liability. They don't say they can prove, meet that standard of proof. And it is only in the reply letter, a reply letter on a Rule 60A motion post-judgment, that they raise the issue, well, everyone should be jointly and severally liable. But again, they don't even lay out a case there. They just say it should be as a matter of course. Thank you. Good morning, Your Honor, and may it please the court. My name is Jonathan Moskin of Foley and Lardner. I will be addressing the waiver issues, and my co-counsel, Mr. Goodman, will then take four minutes of my overall 12 minutes for him to address the cross-appeal, the contempt issue, and so forth. As Your Honors correctly noted, this really is not a case, this is not really a patent law case. This is an issue, the only real issue before Your Honors, is whether the jury system can be undermined by allowing the defendants in this case to raise for the first time on appeal or in their 50B motions issues that they, in some cases, knowingly waived in the district court at trial. It is, I understand, we understand it's not uncommon with the exception, for example, of the argument last Wednesday night in Wright Brothers against Curtis Aeroplane for this court to be hearing patent cases. However, I think a very appropriate lens through which to see the fundamental error of the Antonelli defendant's argument is the fairly recent Supreme Court case, Teva Pharmaceuticals against Sando, 135, Supreme Court 831. Three aspects of that case, I think, are determinative of this appeal. The first, Teva explained, in reviewing an issue of claim construction, the evidentiary underpinnings of that venture, or that process in the law in patent cases. And it held that a clear error standard applies. Here- So in this case, if further factual development is needed, what would that factual development look like? Well, I don't believe further factual development is needed, but what we could have done had they alerted us at trial that they wished to raise this issue. And they did point it out in their pretrial, in the pretrial order that they intended to raise a 101 defense, is we could have had the expert, our expert and the inventor, testify more explicitly as to the inventiveness, the non-abstract nature of the invention. I do think the record shows that, here the experts argued, disagreed quite violently as to the meaning of the claim terms. And as I'm going to come to in a moment, I don't think it's even appropriate now. Mr. Williams, nor am I, is competent to even address the meaning of those claim terms now. We had experts testify below. Neither of us can claim to possess ordinary skill in the art to assess the meaning of those terms. We have nonetheless tried to rebut the arguments that were raised by the Antonelli defendants in their brief. None of which I might add, even cite, there are five pages of argument in their brief. None of which even cite to their own expert's testimony. This is all new, factual interpretation of the claim terms by Mr. Williams, which is inappropriate, of course, at this late stage. We can't pretend, or go back and pretend, that the experts did not fundamentally disagree on the meaning of these claim terms. And again, we could have added to the record with further testimony from our expert. They, too, could have had their expert testify, but they chose not to. As your honors noted, the Alice case was decided more than a month before trial. They had raised the issue of a potential 101 defense in the pretrial order. They were a firm of patent law experts represented at trial by two patent law experts who testified. As I mentioned, in the Teva case is also an acknowledgment of what is fundamental in the law. That only one with ordinary skill in the art, or as the Supreme Court said there, skilled artisans are permitted to address the meaning of claim terms. There were experts here, as well as the inventor who met that test. But if I can refer your honors to one of their dozens of cases that make this point. But one is Gemtron against St. Gobain Corp, 572 F 3rd, 1371. Which makes the obvious point, the uncontroversial point, that unsworn attorney argument is not evidence and cannot rebut actual evidence, which we have here. We can't pretend that there was not an actual trial here after six years of litigation, a three week jury trial. And we simply can't allow the jury deliberations to be upended after appeal with issues that could have been raised below, but that weren't. I also want to address, and Teva addresses this as well, the fundamental difference between an issue of claim construction and an issue of statutory construction. The Supreme Court there made very clear that the private nature of interpreting a patent, as distinct from the very public nature of interpreting a statute, meant that they were fundamentally different. And that is part of the reason why the Supreme Court applied a clear error standard in review. It is nothing like the two cases relied on by the Antonelli defendants here. Pittman against Grayson, whether there existed at all a cause of action for aiding and abetting interference with parental custody, or Baker against Dorfman. Again, a pure question of law, whether there existed a cause of action for negligent infliction of emotional distress. I also want- Can I ask you this, just stepping back, looking at this case and what this invention was about. Can you explain to me exactly, or in some general sense, either way, what this invention was, and if I'm in front of my computer, how do I interact with this invention? Essentially, what the plaintiff, the inventor, Mr. Felici, created here is what is now familiar as behavioral advertising. Of course, he did it in 1997, which was his date of conception, as the trial record shows. So one would, and in the context of a rather concrete context of a game. So that one would log on to the game, the gaming system, the computer network would recognize you, would track what you did by playing the game, which entailed viewing sponsor information on websites, either the sponsor's own website- Do you have to click on to the sponsor? In other words, how does that, let's say on any of these websites, there are sponsors that I never click on, they're just there. Right, but in the incentive, in the very concrete context of this game, the incentive to view the sponsor content was that one had to search for clues in order to advance in the game. So you had to find clues within the sponsor content. You have to click on to the sponsor. Yes, or- To get the clue. Exactly, or in one embodiment of it, they had virtual copies of sponsor websites all hosted within one network, controlled by Protostorm. And then, Protostorm thereby was able to monitor what you were doing, playing the game, and there, in real time, served to you advertising that matched your interests. They could, again, maintain a demographic- How would they know what your interests were? There was part of the, when you signed up for the game, you completed a form with your demographic profile, and there were ways that they subtly got you, created an incentive for you to provide personal information. And all this was done, of course, at the time, back in 1997, when the Internet was populated only by static banner advertising. You could not- I take it what this was, was an early version of, if I go onto my computer and I search for things in Prague, the next day I will find ads on the right-hand side of Gmail of hotels in Prague, cheap airfares to Prague, because they know of my interests. I take it that's what this was, very early on. Yes, love it or hate it, it was the first instance of behavioral advertising of which we are aware. The defendant was able- and had gone through, Fusili would have made mega billions of dollars. Is that the idea? Well, that's, in short form, yes. The argument was that we would have been able to obtain licensing revenues. And I do want to, before, I know my time is, I've passed my time, if I can just say one word, well, two words, actually. Contrary to what opposing counsel has just said, the only mention of a patentability defense in their 50A motion, and it's on page 7, J.A. 728, was a reference to anticipation. That's under 102, 35 U.S.C. 102, not 35 U.S.C. 103, which is the defense they raise here. They have also now, since Your Honor made reference to the issue of damages, their damages calculation was based on a reasonable royalty calculation, not a proof of infringement. In their reply brief, even though they waived any argument as to the damages calculation, which was part of the jury instructions, they didn't object to the jury instructions on the issue of damages, for the first time in their reply brief, the Antonelli firm says, well, this is, we could take a direct appeal under Rule 103B of the Rules of Evidence. But, in fact, the notice of appeal in this case is silent on that as a claim, a ground for appeal. Their original brief in this case said, made no mention of such an argument, and even in their reply brief, and for the first time raising that argument, there's no explanation why Judge Chen got it wrong in allowing our damages expert to testify. On IGEN, on damages, you've got IGEN, right? Which I understand to say that there has to be some infringement. So did you show infringement? The model that we, first of all, I don't believe that IGEN actually said that, if I can respectfully disagree with Your Honor. The issue of what had to be proven was not even raised. What there was a reference to in there was the need to show some royalties, which could be reasonable royalties on a licensing basis. It doesn't mean that there had to be infringement. There was 19 years, projected out 19 years after the issuance of the patent, they could not show there was an actual market that existed. That case says that a plaintiff, and I'm quoting, has sustained no injury unless there has been an infringement against which its patent would have afforded a right of recovery. And the premise of the licensing model is that there would be sufficient threat of infringement that the licensees, the prospective licensees, would enter into a license rather than litigate an infringement case. The defendant's own expert witness, Mr. Nixon, agreed in his report that was a perfectly proper and appropriate way to monetize a patent. Again, it's inappropriate, again, for the first time to raise this on appeal. IGEN, I think, is a little bit ambiguous. I don't mean to suggest it's crystal clear in endorsing our damages model. But one thing I think I can say from the very short two-page decision there, that there was no express decision to preclude use of licensing, which is commonly done, very commonly done, in establishing the valuation of a patent. Thank you. May it please the Court. Robert Goodman for ProtoStorm. I'll be addressing Mr. Brundage's appeal, ProtoStorm's cross appeal, and the finding of contempt by Judge Cianbolo. First of all, with respect to Mr. Brundage's appeal, A, he was the responsible partner, and B, what he did on September 20, 2001, when he issued a stop work order on that patent, was completely unprofessional and outrageous and wanton, which not only made it proper for him to be found liable, but also for punitive damages. He let you know about it, didn't he? No. On September 20th, he said nothing about the fact that he had stopped work. On September the 20th, and, but he stopped work knowing about two deadlines. On September 23rd, Your Honor, there was a deadline to extend the time to file a power of attorney, and on September 27th, there was a deadline to confirm the countries in which you wanted a patent application to be made, or to correct any mistakes that you might have made, such as leaving out the United States, when you'd put in every other country in the world. The fact of the matter is that he did not, when he had later communications with Kathy Worthington, an IT attorney for ProtoStorm, on September 25th and 27th, he said nothing about those deadlines. When he then wrote on October 1 in the letter that he wrote, he said nothing about those deadlines, and he admitted on trial that when he issued the stop work order, he knew about those deadlines, and he did nothing to extend either of those deadlines, and he admitted also that proper professional behavior requires that if you are going to stop work on something, that you tell the client about the deadlines. He didn't do it. As I said in my brief, he deep-sixed this patent application, and he made sure that nobody would be able to fix it by his behavior. Now, with respect to the cross-appeal, we did show that Mr. Brundage and Mr. Bailey were liable. The jury said so. So the only question then is whether or not you use the general principles of tort law. Under general principles of tort law, the liability gets attributed to the principal. Under respondeat superior, and- Let's talk about if you could address what happened at trial, where it seems that you or the lawyer seems to have authorized a district court to allocate damages and allow for the possibility that percentages of fault attributed to Bailey and Brundage should be attributed to ATS and K for the purposes of damages allocation. No, what we were asking- Let me just- I'm sorry, Your Honor. If you could just wait for me to finish. If you go to trial transcript 2839, the court says, I agree that Mr. Calavita, that I can and I assume Mr. Calavita has waived any objection. I can postpone judgment, reallocate any percentage assigned to the individual defendants back to ATS and K on the theory that I think everyone agrees that the principles, are attributable to the law firm. I think that Mr. Calavita could not argue that 10% that went to Mr. Brundage has to be paid to ATS and K. Do you agree with that, Mr. Calavita? Mr. Calavita says, yes, Your Honor. I think that's the law anyhow, the court. So he is waiving post-objection to that. Mr. Goodman then says, when you say post-judgment, the judgment that is actually entered would recognize the attribution, would it not? The court, I should say post-verdict. Well, the point is, Your Honor, what I was arguing for there, was the application of the doctrine of respondeat superior. Of course, the liability of the individual agents is attributable to the principle. And therefore, the principle should be liable for the entire amount. What I was concerned with and what I didn't want to happen, was that we'd be left with a situation where the individuals would just have liability against them, and the company would not have the liability that had been found by the jury against the individuals, which would have been a violation of the doctrine of respondeat superior. But then what Judge Chen did, she basically said, you can't have it both ways. Now that I've attributed the liability of the individuals to the company, well, they're not liable anymore for compensatory damages. But that is directly contrary to tort law. Tort law says that attributing the liability of the agents to the principle does not relieve the agents of their tort liability. And that was the error that was made here. And we had asked for joint and several liability. The letters prior to the entry of the judgment asked for joint and several liability, and then we asked for the full amount, which is what should be applied here. Mr. Brunage and Mr. Bailey should be liable jointly and severally with ATS&K for the full amount of the judgment. And that kind of, those principles are pretty well laid out, particularly in the reply brief we filed in the quote that we have from the DER, D-E-R, travel services case, which is on the reply brief. And I think that's pretty clear. Thank you. Now, with respect to the, can I- You're over your time. Could I say a moment on the contempt? Yeah. All right. With respect to the contempt, I think the way I would put it is being out of business is not in the ordinary course of business. And Your Honor asked Mr. Williams whether or not he had any authority that would have justified not finding the contempt here. And I will tell you that when you look at his brief, you don't see any cases at all on that position. And we've got a case cited. They were out of business and they had been skirting very close to the line throughout the history of the judge's order to protect them from not having to file a bond. They didn't even tell us for a month that they were out of business while they snuck out and their lawyers went to other law firms, completely obliterating the whole purpose of the judge's order, which it sought to protect them without having to file a bond. This is an instance where they skirted close and then they violated. And it's the type of thing, Your Honor, that I think if this court doesn't uphold, it sends a bad message to the district court judges when they issue a contempt order. Thank you. Thank you very much. Mr. Williams? Thank you, Your Honor. A couple of quick points. First, my colleagues argue that Section 101 challenges can't be decided as a matter of law. That's just simply untrue, and we've cited multiple, multiple cases to the contrary. The question here is whether the patent or the hypothetical claims included generic computer functions. ProtoStorm has actually conceded that is the case. That is the only question. As Mr. Moskin said before you, what would you have proved in addition? He didn't talk about doing something to a computer. He talked about novelty. Novelty is not the question under Alice. And, in fact, the Federal Circuit in Ultramercial states explicitly, as do many, many other cases, that the use of the Internet includes no inventive concept. This is not a factual question. This is a pure question of law. Relatedly, there are, I should say, there are a very narrow set of circumstances when it can be a factual question, and that arrives under DDR. DDR says that if a software patent teaches a technological solution, then you may have an exception to the general Alice rule. And here, it does not teach us a technological solution. It doesn't purport to have a technological solution. It purports to apply a very old concept, behavioral advertising, which, as Your Honor pointed out, is simply giving more advertising to someone based on their interest in something else, which one court described as a concept as old as know your audience, long preexisting the Internet. And it doesn't teach that solution in any event. It doesn't say how to do that. It says use the Internet, use the computer, and go have behavioral advertising. Nothing more. It talks about computers talking to computers over the Internet. It talks about tracking data. It talks about providing more data. It doesn't say how to do that. This is not a case in which there's a reasonable interpretation of the patent that it teaches a technological solution. Damages, you're exactly right on IGEN. IGEN is actually a patent prosecution malpractice claim in which the plaintiff was trying to prove lost future revenues based on licensing. It is exactly this case. And it is why their damages are too speculative and haven't been proved in the lack of infringement. Lastly, as you'll note, they talk about, again, the purpose of the order here. They do not talk about a violation of the terms of the order. It's the purpose of the order. That's exactly what the district court expressly stated on the record. That is not a basis for contempt. And finally, Mr. Schiavelli was held in contempt personally. And as you may know, as you know, the requirement for contempt is clear and convincing evidence. Mr. Schiavelli, there was no evidence that he approved of these challenge payments. He merely was the previous, the former managing partner of ATSK. He was not the managing partner during the time period when these payments were made. And that is not clear and convincing evidence, particularly in light of the due process requirements inherent in contempt. Thank you. Mr. Spiro, you'll have a total of two minutes. Thank you, Your Honor. Your Honor, I'd just like to address two points. The first is on joint and several liability. Plaintiff at all times during this case, the trial record is clear, was focused on proving damages and attributing damages to ATS and K. The citation of the trial record is one of many instances that shows that. I think the most important and compelling point is the first time they asked for joint and several liability was the Rule 68 reply letter. Exactly what Your Honor had pointed out, 100% to everyone. It didn't come until well after the judgment. And even at that point, they never offered a proof and there's never been a proof provided to satisfy the requirements for joint and several liability. The other point is just to follow up on something that I didn't fully cover before, which is exactly what Mr. Brundage said in the months where they terminated their relationship. The record shows that in August and September, ATS and K repeatedly requested a power of attorney and repeatedly let the plaintiff know of deficiencies with his patent. September 20th, internally, Mr. Brundage, after he had learned that one of their other counsel had stopped work based on non-payment of fees, had told his team to stop paying fees to stop doing work as well. September 25th, they reached out and alerted plaintiff to that. By October 1st, they sent a formal letter, and it's an important letter to look at. Given the deadline, the 25th or 27th, wasn't he better put to let them know as soon as he issued the stop work order to people, that he had, in fact, done that? Not after the two deadlines, I think, in late September. So the deadline for the power of attorney, he did let them know about that. He let them know once. They never responded. He extended it without a response from them. The second time, he let them know again, and they just still didn't respond. So they were fully aware of the deadline for the power of attorney. The second deadline, they said Mr. Brundage was aware of it. He was aware that, as a matter of course, there's a deadline for amending your countries. But he didn't know, and what he missed, which was the mistake in this case, was that the United States wasn't checked. What I'm raising is his obligation to notify them that his firm was no longer going to do any work on the matter, even though they did, prior to the deadline. So he was not even aware that the deadline was applicable because he didn't know that the firm hadn't checked the United States. He would be alerting them to a deadline that he didn't know was relevant. And the other deadline, he did. He did, and he extended it, and he kept asking them. And even the October 1st letter, he clearly said we are stopping work, and if you take no further action, your patent will be abandoned. It was clear on that point. The last point is the December notes, which I think are also critically important because they were somewhat distorted in the trial record. But if you look right at the notes, and it's JA 1242 through 1248, it was Dale Hogue. The notes say, Dale calls back. Some procedural things need to be done. They can be done any time. Mr. Brundage had no idea Dale Hogue said that. That was on December 11th. On December 12th, they got through to Mr. Brundage, and at this point, he had already told them he wasn't working for them anymore. And he said, the PCFT application's been filed, but it's in limbo. That's a completely different statement, and it's factually accurate. Thank you all for your arguments. The court will reserve decision.